IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF TENNESSEE
(Columbia Division)

| | | |
|---|---|---|
| **REBECCA YOUNG**, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | No. 1:15-cv-107 |
| | ) | |
| **GILES COUNTY BOARD OF EDUCATION, PHILLIP J. WRIGHT**, in his individual and official capacity as Director of Schools for Giles County, Tennessee, and **MICAH LANDERS**, in his individual and official capacity as Principal of Richland High School, | ) ) ) ) ) ) ) ) | |
| | ) | |
| Defendants. | ) ) | |

**MEMORANDUM IN SUPPORT OF MOTION FOR
A PRELIMINARY INJUNCTION**

Rebecca Young ("Plaintiff"), through undersigned counsel, submits this memorandum in support of Plaintiff's Motion for a Preliminary Injunction.

**INTRODUCTION**

Rebecca Young and her Mother are suing Defendants to stop ongoing and unlawful violation of a high school student's right to freedom of expression. At the beginning of this school year, on or about August 5, 2015, the plaintiff student, Rebecca Young ("Rebecca"), wore a T-shirt to school bearing the message "Some People are Gay, Get Over It" (the "T-shirt"). Rebecca wore the T-shirt at a time when LGBT rights were perhaps the most discussed political topic of the day. Rebecca wore the T-shirt throughout the day without incident. Unfortunately, at the end of the day, Rebecca's school principal, Micah Landers**,** thwarted her calm, passive expression of her beliefs when he informed Rebecca that the school prohibited her from wearing the T-shirt, or

1

any other shirt referencing the LGBT lifestyle or rights, because such clothing might make her a target of bullying. Both Principal Landers and the director of schools for the Giles County Board of Education (the "Board"), Phillip J. Wright ("Wright"), confirmed this prohibition in conversation with Rebecca's mother, explaining that such clothing, including any clothing with a rainbow symbol, would not be tolerated. The Board further confirmed this ban in writing, stating that Rebecca "would have been bullied or harassed by other students" and that the "shirt's writing would have caused a disturbance in the educational environment." The Board then referenced its policy that requires students to "exercise good taste with regard to their personal appearance" and that further mandates that a school principal "administer appropriate punishment, which may include suspension and/or expulsion" for violations.

Plaintiff asks this Court for a preliminary injunction because Principal Landers' actions and threats, fully approved, supported and reiterated by Wright and the Board, constitute an ongoing violation of Rebecca's First Amendment rights that has caused, and continues to cause, irreparable harm. The First Amendment protects Rebecca's right to express her support for – and solidarity with – LGBT people and their allies in promoting tolerance and political inclusion.

## STATEMENT OF FACTS

On the first day of school, August 5, 2015, Rebecca wore a shirt to Richland High School bearing the slogan "Some People Are Gay, Get Over It." (Ver. Comp. ¶¶ 21-22). The first day of school was a half day, so school was dismissed earlier than the normal time. *Id.* ¶ 22. Rebecca wore her shirt throughout the school day, and received no threats concerning the message on her shirt during the day. *Id.* ¶ 23. No student or faculty member expressed to or otherwise interacted with Young in a manner manifesting any hostility, disapproval or offense to the message on her shirt. *Id.* ¶ 24.

Despite the absence of any disruption or hostile reaction to the shirt, at the end of the school day, Defendant Landers called Rebecca to the front of a cafeteria full of students and publically reprimanded her for wearing the shirt. *Id.* ¶ 25. Landers told her that she could not wear that shirt or any other shirt referencing LGBT rights to school because it made her a target for bullying and provoked other students. *Id.* ¶ 26. That afternoon, Gelinda Young, Rebecca's mother, called Landers and confirmed that he had forbidden Rebecca from wearing the shirt or any other apparel which bore phrases, symbols, slogans or other indicia of or in support of the LGTB community, for the same reasons he had cited to Young at the cafeteria: he claimed that he was protecting Young from bullying or harassment. *Id.* ¶ 27.

Gelinda Young then called Defendant Wright to discuss this censorship. *Id.* ¶ 28. Wright expressed his approval Landers's actions and stated that the shirt, or any clothing expressing support for LGBT people or LGBT rights, violated the school's and the Board's dress code. *Id.* ¶¶ 29-30. Wright stated that pro-LGBT messages are sexual in nature and, therefore, prohibited by the dress code. *Id.* ¶ 31. Wright also stated that any clothing bearing such expressions, including simply a rainbow symbol, would not be tolerated at Richland High School. *Id.* ¶ 32.

On August 18, 2015, Young, by and through her counsel, sent a letter contesting the censorship of Young's choice of apparel to express her support for LGBT rights. *Id.* ¶ 33; a copy of the August 18, 2015 letter is attached as Ex. 1. Wright responded by letter on August 31, 2015 stating that "[d]ue to the nature of the shirt's writing and the environment at the school, Rebecca Young would have been bullied or harassed by other students." *Id.* ¶ 34; a copy of the August 31, 2015 letter is attached Exhibit 2. Wright also stated that "[t]he shirt's writing would have caused a disturbance in the educational environment of Richland School." *Id.* ¶ 35; Ex. 2.

Wright confirmed that Landers "has the autonomy to evaluate the nature of his school and what constitutes a situation that would erupt into a substantial interruption of the learning environment." *Id.* ¶ 36; Ex. 2.  Finally, as justification for Landers action Wright cited to Giles County Board Policy 6.310, which states

> In order to maintain an atmosphere conducive to learning and to prepare students for working environments, the Giles County School System requires that all students, grade K-12, exercise good taste with regard to their personal appearance. Attire considered disruptive or risky to health or school/personal safety is not appropriate.

*Id.* ¶ 37; Ex. 2.  Wright also pointed to the portion of the policy which states, "[w]hen a student is attired in a manner which is likely to cause disruption or interference with the operation for the school, the principal shall administer appropriate punishment, which may include suspension and/or expulsion." *Id.* ¶ 38; Ex. 2.

There has been no disruption of the educational environment at Richland High School caused by students expressing support of the fair treatment of gay, lesbian, bisexual or transgender people. *Id.* ¶ 39.

## ARGUMENT

As discussed below, an analysis of the four-factor test governing the issuance of preliminary injunctions demonstrates that Rebecca is entitled to preliminary injunctive relief during the pendency of these proceedings.

### I. THE PRELIMINARY INJUNCTION STANDARD AND PURPOSE.

Generally, courts consider four factors when deciding whether to issue a preliminary injunction. The four factors are:

(1) whether the movant has a strong likelihood of success on the merits;

(2) whether the movant would suffer irreparable harm without the injunction;

4

> (3) whether issuance of the injunction would cause substantial harm to others;
>
> (4) whether the public interest would be served by the issuance of the injunction.

*Bonnell v. Lorenzo*, 241 F.3d 800, 809 (6th Cir. 2001); *see also Barber v. Dearborn Pub. Sch.*, 286 F. Supp. 2d 847, 851 (E.D. Mich. 2003). Courts balance these four factors in their analysis, as no single factor is dispositive. *Barber*, 286 F. Supp. 2d at 851 *(citing Neveux v. Webcraft Tech., Inc.*, 921 F. Supp. 1568, 1570-71 (E.D. Mich. 1996) (citing Performance Unlimited v. Questar Publishers, Inc.*, 52 F.3d 1373, 1381 (6th Cir. 1995)).

The primary purpose of a preliminary injunction is to maintain the status quo until a final decision on the merits can be reached. *Barber*, 286 F. Supp. 2d at 851 (*citing Univ. of Texas v. Camenisch*, 451 U.S. 390, 395 (1981)). When a school interferes with a student's freedom of expression, the status quo that should be maintained is the right to expression as it existed before the school chose to interfere with that right. *Barber*, 286 F. Supp. 2d at 860 (*citing Chambers v. Babbitt,* 145 F. Supp. 2d 1068 (D. Minn. 2001) ("[T]he Court's decision to grant injunctive relief serves to reinstate the *status quo* as of [the date the clothing was banned] . . . .")).

## II. REBECCA HAS A SUBSTANTIAL LIKELIHOOD OF SUCCESS ON THE MERITS.

Rebecca has a very strong likelihood of succeeding on her First Amendment claim. Undeniably, Rebecca's T-shirt is "speech" covered by the First Amendment because it contains a particularized message that expresses a certain viewpoint. *See, e.g., Castorina v. Madison County Sch. Bd.*, 246 F.3d 536, 539 (6th Cir. 2001) (reversing a district court decision that T-shirts displaying two Confederate Flags and the message "Southern Thunder" did not qualify as "speech"); *see also Nixon v. Northern Local Sch. Dist. Bd. of Ed.*, 383 F. Supp. 2d 965 (S.D. Ohio 2005) (*holding* that the wearing of a T-shirt bearing the messages "Homosexuality is a sin!," "Islam is a lie!," and "Abortion is murder!" "clearly constitutes expression under the First Amendment.").

5

On the other hand, Defendants have proffered no legitimate reason for restricting Rebecca's First Amendment rights, relying instead on analysis that amounts to an impermissible heckler's veto.

**A. THE SUPREME COURT, THIS CIRCUIT AND CASES FROM OTHER CIRCUITS DEALING WITH CENSORSHIP OF STUDENT SUPPORT FOR LGBT RIGHTS CLEARLY DEMONSTRATE THAT REBECCA HAS A HIGH LIKELIHOOD OF SUCCESS ON THE MERITS.**

Forty years ago, in the landmark case of *Tinker v. Des Moines Indep. Sch. Dist.,* 393 U.S. 503 (1969)*,* the United States Supreme Court held that the First Amendment protects the free speech rights of students at schools. *Tinker,* 393 U.S. at 506. In *Tinker,* the Supreme Court stated that "the unmistakable holding of this Court for almost 50 years" has been that "[i]t can hardly be argued that either students or teachers shed their constitutional rights to freedom of speech or expression at the schoolhouse gate." *Id. Tinker* emphasized that "educating the young for citizenship is reason for scrupulous protection of Constitutional freedoms of the individual, if we are not to strangle the free mind at its source and teach youth to discount important principles of our government as mere platitudes." The *Tinker* Court further affirmed that:

> The vigilant protection of constitutional freedoms is nowhere more vital than in the community of American schools. The classroom is peculiarly the 'marketplace of ideas.' The Nation's future depends upon leaders trained through wide exposure to that robust exchange of ideas which discovers truth 'out of a multitude of tongues, (rather) than through any kind of authoritative selection.'

*Tinker,* 393 U.S. at 512.

Against this backdrop, the Supreme Court set forth a test to assess the respective interests of students and school officials in determining which party should prevail on a First Amendment problem. Under the *Tinker* test, student speech in a public school may only be censored if it would "materially and substantially interfere with the requirements of appropriate discipline in the operation of the school" or "collid[e] with the rights of others." *Tinker,* 393 U.S. at 509. The Court

6

also mandated that school officials' fear of material and substantial interference must be based on something real and identifiable in the school setting because "undifferentiated fear or apprehension of disturbance is not enough to overcome the rights to freedom of expression." *Id.* at 508.

Numerous courts have applied the *Tinker* standard in cases involving student T-shirts and have issued preliminary injunctions when there is an absence of evidence that the T-shirt would cause material and substantial disruption. *See, e.g., Nixon*, 383 F. Supp. 2d at 973-4. (granting preliminary and permanent injunction to student who was prohibited from wearing a T-shirt bearing anti-gay, anti-Islam and anti-abortion messages); *Nuxoll v. Indian Prairie Sch. Dist. 204*, 523 F.3d 668 (7th Cir. 2008) (overturning the denial of a preliminary injunction requested by a student who was prohibited from wearing a T-shirt bearing the message "Be Happy, Not Gay"); *Barber*, 286 F. Supp. 2d at 847 (issuing an injunction protecting student's right to wear a T-shirt displaying a photograph of President George W. Bush with the caption "International Terrorist"); *Chambers v. Babbitt*, 145 F. Supp. 2d 1068 (D. Minn. 2001) (granting preliminary injunction on behalf of student prevented from wearing T-shirt with the message "Straight Pride"); *Gillman ex rel. Gillman v. School Bd. For Holmes Co., Fla.*, 567 F. Supp. 2d 1359 (ND Fla. 2008) (granting preliminary injunction to allow student to wear rainbow belt and "I support Gays" T-shirt). In each of these cases, the courts granted the student a preliminary injunction because the *Tinker* standard showed that they had a strong likelihood of prevailing on their claims. *See also Castorina,* 246 F.3d at 540-41 (6th Cir. 2001) (concluding, in a different procedural posture, that *Tinker* applies to student T-shirt cases and reversing summary judgment in favor of school district that prohibited student from wearing a shirt bearing the image of the Confederate flag).

Application of the *Tinker* standard demonstrates that Rebecca will certainly prevail on her First Amendment claim because there is no evidence that her T-shirt did cause, or would cause, a

material and substantial disturbance in the school. Indeed, Rebecca wore the T-shirt for the school day with no disruption at all. Nevertheless, Principal Landers issued his edict prohibiting her from wearing the T-shirt, a decision that was ratified by Wright and the Board in writing, with a threat of suspension or expulsion. There had been no prior disruptions related to the issue of LGBT lifestyles or rights, and the only disruption Defendants claim represents an undifferentiated, speculative fear, and a fear of events likely to be caused by other students, not Rebecca. It is simply undeniable that Rebecca's silent, passive display of an inclusive, positive, supportive T-shirt did not and would not reasonably cause the kind of serious disruption *Tinker* requires before this school could abridge Rebecca's free speech rights.

Defendants have offered no legitimate basis for restricting Rebecca's speech. In all of their pre-litigation communication, they have indicated that they are restraining Rebecca's speech because they fear *other students* might bully or harass her. In other words, Defendants' logic appears to be that the school must victimize Rebecca to prevent others from victimizing her, rather than addressing and disciplining whatever other students might misbehave in the future.

While certain other situations have been found to warrant limitations on student speech in schools, none of those situations exist in this case. For instance, in *Bethel School Dist. 403 v. Fraser*, 478 U.S. 675 (1986), the Supreme Court allowed that schools may restrict speech that is clearly vulgar, lewd and obscene, because such speech is incongruent with a school's basic mission (a student made lewd comments about another student in a school speech). In *Hazelwood Sch. Dist. v. Kuhlmeier,* 484 U.S. 260, 266 (1988), the Supreme Court allowed a school's restrictions on speech where the speech could be construed as "school sponsored speech" made or endorsed by the school (a school newspaper). Finally, in *Morse v. Frederick*, 551 U.S. 393 (2007), in a decision that was explicitly narrowly tailored to the issue before it, the Supreme Court allowed a

8

school to restrict speech by a student that promoted the use of illicit drugs. If the disputed speech does not fall within one of these narrow exceptions, the *Tinker* standard applies. In this case, the speech is not lewd, is not "school sponsored" and does not promote the use of illicit drugs, so Defendants can only restrict the speech if it demonstrates a reasonable likelihood of substantial disruption of school discipline.

In the case at bar, Defendants have not even attempted to articulate a reasonable likelihood that Rebecca's speech will cause a serious disruption at the school. There has been no prior disruption related to this issue, and there was no disruption when Rebecca wore the T-shirt for a full day. Rather, implicitly acknowledging that Rebecca and her shirt will not cause a disruption, Defendants have repeatedly claimed that they are banning Rebecca's speech to protect Rebecca, specifically from bullying and harassment by other students.

Defendants' stated reason for abridging Rebecca's speech rights amounts to imposition of a heckler's veto, an argument specifically rejected by the Court in *Tinker* and in case after case since. Specifically, in *Tinker,* the Supreme Court addressed the very fear Defendants articulate here, that other students might react poorly to the speech, as follows:

> The District Court concluded that the action of the school authorities was reasonable because it was based upon their fear of a disturbance from the wearing of the armbands. But, in our system, undifferentiated fear or apprehension of disturbance is not enough to overcome the right to freedom of expression. Any departure from absolute regimentation may cause trouble. Any variation from the majority's opinion may inspire fear. Any word spoken, in class, in the lunchroom, or on the campus, that deviates from the views of another person may start an argument or cause a disturbance. But our Constitution says we must take this risk, *Terminiello v. Chicago*, 337 U.S. 1 (1949); and our history says that it is this sort of hazardous freedom—this kind of openness—that is the basis of our national strength and of the independence and vigor of Americans who grow up and live in this relatively permissive, often disputatious, society.

*Tinker*, 393 U.S. at 509 (citations in original).

Defendants have enacted a heckler's veto. They have allowed the specter of disruption or the mere theoretical possibility of discord to motivate their infringement of Rebecca's fundamental free speech rights. Laws mandate young people to spend a substantial portion of their lives in classrooms, so student expression cannot be suppressed simply because it gives rise to some slight, easily overlooked disruption, including but not limited to 'a showing of mild curiosity' by other students, discussion and comment among students or even some 'hostile remarks' or 'discussion outside of the classrooms by other students. *Gillman*, 567 F.Supp.2d. at 1370. Simply put, the fact that others may disagree with the speech, or that the speech is unpopular, cannot serve as a basis for restricting speech. *Forsyth County Ga. V. Nationalist Movement*, 505 U.S. 123, 134-35 (1992) ("[l]isteners' reaction to speech is not a content-neutral basis for regulation" so government prohibited from burdening speech because it might offend a hostile mob); *Leonard v. Robinson*, 477 F.3d 347, 360 (6th Cir. 2007).

Rebecca's T-shirt falls unambiguously on the side of the cases governed by *Tinker* that cannot be banned by the schools. In case after case from around the country, courts considering this exact issue--a school's effort to restrict student speech on a shirt addressing the issue of LGBT rights--have ruled that *Tinker* applies and that the student must be allowed to wear the shirt.

For instance, in *Nuxoll*, the 7th Circuit considered whether a school could prohibit a student from wearing a T-shirt opposing gay rights. 536 F.3d 668. Even though there had been incidents of harassment of homosexual students, the Court held that "it is highly speculative that allowing the plaintiff to wear a t-shirt that says 'Be Happy, Not Gay would have even a slight tendency to provoke such incidents." *Id.* at 676. As a result, and following *Tinker*, the 7th Circuit issued a preliminary injunction in favor of the student. *See also Chambers*, 645 F.Supp.2d at 1068 (District Court for Minnesota protected student's free speech rights expressed through T-shirt bearing the

slogan "Straight Pride") and *Nixon*, 383 F.Supp.2d 965 (Southern District of Ohio protected a student's right to express opposition to gay rights by wearing a shirt that said, among other things, "homosexuality is a sin.").

In *Gillman*, the Northern District of Florida declared a school's prohibition against students wearing T-shirts and apparel expressing support for LGBT right unconstitutional. 145 F.Supp.2d 1359. In *Gillman*, a high school principal prohibited students from expressing any support for LGBT rights through apparel or symbols, including displays of the phrase "Gay Pride" or "GP". *Id.* at 1363. In spite of the prohibition, the plaintiff wore a rainbow belt and a t-shirt bearing the slogan "I Support Gays" to school. *Id.* The plaintiff also sought clarification about the prohibition from the governing school board, which ratified the principal's prohibition and further prohibited a long list of slogans and symbols showing support for the fair treatment of LGBT people. *Id.* at 1363-64. The District Court judge rejected the argument that t-shirts and apparel supporting equality for LGBT people could reasonably cause the kind of substantial disruption required by *Tinker* for a school to restrict student speech, characterizing the prohibition as "a ban on speech by students that is not vulgar, lewd, obscene, plainly offensive, or violent, but which is pure, political, and expresses tolerance." *Id.* at 1370. Indeed, rather than the speech causing a disruption to the educational experience, the court noted that the shaming of homosexual students was more likely to disrupt, saying "it is well established that attacks on students on the basis of their sexual orientations are harmful not only to the students' health and welfare, but also to their educational performance and their ultimate potential for success in life." *Id. (quoting Harper v. Poway Unified Sch. Dist.,* 445 F.3d 1166, 1178–79 (9th Cir.2006). The Court noted that

> Obviously, political speech involving a controversial topic such as homosexuality is likely to spur some debate, argument, and conflict. Indeed, the issue of equal rights for citizens who are homosexual is presently a topic of fervent discussion and debate within the courts, Congress, and the

> legislatures of the States, including Florida. The nation's high school students, some of whom are of voting age, should not be foreclosed from that national dialogue.

*Id.* at 1374. In light of the importance of the speech at issue, which is the same speech at issue in this case, and that the school could not show a basis for reasonably forecasting a substantial disruption to the school's functioning, the court declared the policies unconstitutional. *Id.* at 1375.

Just like the t-shirt at issue in *Gillman*, "Some People Are Gay, Get Over It" is a message of acceptance. It is a message that urges tolerance of differences, respect for diversity, and opposition to bullying of LGBT students. This message represents the very interchange of ideas that the First Amendment, at its core, is intended to encourage and protect. Consistent with these important First Amendment principles, Defendants cannot be permitted to censor Rebecca just because they are uncomfortable with her message that all students should be accepted, regardless of their sexual orientation. Rebecca has a high likelihood of success on the merits because *Tinker* and case after case indicate that she will prevail, while Defendants' claimed reasons for censoring her are clearly without legal support.

**B. REBECCA HAS SUFFERED AND WILL CONTINUE TO SUFFER IRREPARABLE HARM WITHOUT INJUNCTIVE RELIEF**

The second prong of the preliminary injunction test – whether the movant would suffer irreparable harm without injunctive relief – also supports entry of a temporary injunction. The loss of First Amendment rights, even for a short amount of time, is presumed to constitute irreparable harm. *Elrod v. Burns*, 427 U.S. 347, 373 (1976). Courts routinely find this general principle applicable in cases involving the rights of students to wear expressive T-shirts to school. *See, e.g., Nixon*, 383 F. Supp. 2d at 974; *Barber*, 286 F. Supp. 2d at 858; *Chambers*, 145 F. Supp. 2d at 1072.

In this case, Defendants have repressed and chilled Rebecca's First Amendment rights for months. If the Defendants are not prohibited from interfering with Rebecca's right to wear her T-shirt, or other expressive clothing, pending this litigation, Rebecca's ongoing injury will only be exacerbated. Thus, preliminary injunctive relief is particularly important in this matter.

### C. A PRELIMINARY INJUNCTION WILL NOT CAUSE SUBSTANTIAL HARM TO OTHERS

The third prong of the test – whether a preliminary injunction would cause substantial harm to others – clearly weighs in favor of issuing an injunction. Defendants have not and cannot identify any way in which their interests (or the interests of anyone else) would be harmed if Rebecca is permitted to wear her T-shirt and similarly expressive clothing to school. *See, e.g., Nixon*, 383 F. Supp. 2d at 974-75 ("Defendants will not suffer any harm if they are enjoined from enforcing an unconstitutional policy . . . .").

### D. A PRELIMINARY INJUNCTION WILL SERVE THE PUBLIC INTEREST.

The final prong of the test – the public interest – also strongly supports granting preliminary injunctive relief. The abridgement of First Amendment rights constitutes irreparable harm, so courts routinely conclude that issuing injunctions to protect those rights serves the public interest. Indeed, "protection of constitutional rights, and particularly First Amendment rights, ***is always in the public interest***." *Nixon*, 383 F. Supp. 2d at 975 (citing *Gannett Co., Inc. v. DePasquale*, 443 U.S. 368, 383 (1979) (emphasis added), and *G & V Lounge, Inc. v. Michigan Liquor Control Comm'n*, 23 F.3d 1071, 1079 (6th Cir. 1994))*; see also Barber*, 286 F. Supp. 2d at 859-60 and *Chambers*, 145 F. Supp. 2d at 1073.

### CONCLUSION

For the foregoing reasons, Plaintiff respectfully asks this Court to enter an order preliminarily enjoining Defendants from interfering with Rebecca Young's right to wear the

13

Case 1:15-cv-00107   Document 6   Filed 11/24/15   Page 13 of 14 PageID #: 34

## CERTIFICATE OF SERVICE

    I hereby certify that on this, the 24th day of November, 2015, I served a true and correct copy of the foregoing document along with service of the Summons and Complaint via Certified U. S. Mail return receipt requested and by operation of the Court's electronic filing system to the following:

Giles County Board of Education
C/O Richie Brewer
Chairman
270 Richland Drive
Pulaski, TN 38478

Micah Landers
Principal
Richland High School
10610 Columbia Hwy
Lynnville, TN 38472

Phillip J. Wright
Director of Schools
Giles County Schools
270 Richland Drive
Pulaski, TN 38478

                        /s/ Thomas H. Castelli