IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF TENNESSEE
(Columbia Division)

| | |
|---|---|
| REBECCA YOUNG, ) | |
| ) | |
| Plaintiff, ) | |
| ) | |
| v. ) | No. 1:15-cv-000107 |
| ) | Judge Sharp |
| GILES COUNTY BOARD OF ) | |
| EDUCATION, PHILLIP J. WRIGHT, ) | |
| in his individual and official capacity as ) | |
| Director of Schools for Giles County, ) | |
| Tennessee, and MICAH LANDERS, in his ) | |
| individual and official capacity as Principal ) | |
| of Richland High School, ) | |
| ) | |
| Defendants. ) | |
| ) | |

**PLAINTIFF'S RESPONSE TO DEFENDANTS'
MOTION FOR RELIEF FROM ORDER PURSUANT TO RULE 60**

Plaintiff, through undersigned counsel, submits this Response to Defendants' Motion for Relief From Order Pursuant to Rule 60:

*Introduction*

On December 22, 2015, this Court entered an Order granting Plaintiff's Request for a Preliminary Injunction prohibiting Defendants' from censoring her purely political speech in support of gay rights expressed by a Tshirt with the slogan "Some People are Gay. Get over It." (Docket Entry 11). The Court entered a full Memorandum Opinion in addition to its Order, noting the strength of Plaintiff's case and the failure of Defendant to Respond to the Complaint or request for injunctive relief. On January 5, 2016, Defendant filed its Answer and the pending motion seeking relief from the Court's Order granting the injunction. Defendants claim excusable neglect in the

form of miscommunication between lawyer and client, and a belief that the responses were not yet due.

Plaintiff acknowledges that Defendants' failure to respond in a timely manner to her request for a preliminary injunction could be the result of a mistake or excusable neglect. She agrees that defense counsel communicated with Plaintiff's counsel prior to entry of the Court's Order, and that Plaintiff's counsel agreed to a request for an extension of time. Plaintiff offers no opinion on whether Defendant's conduct meets the standard of mistake or excusable neglect for reopening the decision and leaves that decision in the sound discretion of the Court.

However, the Court need not reach such a decision. As Defendants brief observes, relief under Fed. R. Civ. P. 60 requires more than mistake or excusable neglect, it also requires a finding that the moving party presents a meritorious claim or defense. In re Gibson and Epps. L.L.C., 468 B.R. 279, 290 (E.D. Tenn. 2012) (*citing*, Williams v. Meyer, 346 F.3d 607, 613 (6th Cir. 2003)), *quoting* United Coin Meter v. Seaboard Coastline R.R., 705 F.2d 839, 844-45 (6th Cir. 1983).

In this case, Defendants' affidavits and assertion of additional facts do nothing to change the outcome, even if every fact they allege is taken as true. Defendants have merely offered the same facts which the court assumed as true when making its decision initially. Simply put, speculation that other students might bully or harass Plaintiff provides no legal justification for the censorship of Plaintiff's speech.

### *Defendants' Argument*

Although Defendants have presented lengthy affidavits claiming additional facts upon to justify their censorship, all of these facts boil down to one: Plaintiff has been bullied by other students for years because of her sexual orientation. (***Landers Aff. ¶¶ 19-43).*** Based on this history of Plaintiff's victimization by others, and the fact that the school has a mandate to protect students

2

from bullying, Defendants claim Plaintiff's Tshirt is likely to lead to more bullying, which, in the eyes of Defendants, constitutes a substantial and material disruption of the school's educational mission sufficient to justify its censorship.

Defendants' facts are more notable for what they do not say. Nowhere have Defendants denied that Plaintiff wore the shirt to school *without disruption*. It is clear that while Plaintiff has been the subject of harsh words, and that the school has been required to address the bullying, no violence has ever been associated with these behaviors. The school does not cite to any class that has been disrupted. The school does not claim that any student or teacher has expressed difficulty with the actual learning mission of the school. Perhaps most importantly, in all of its twenty-four (24) paragraphs devoted to describing Plaintiff's experience of bullying by others, not once does the school indicate that Plaintiff's *speech* triggered the bullying. Rather, throughout the affidavit and brief, Defendants describe the reality that Plaintiff's status as a LGBT person motivates bullying, not Plaintiff's speech on the subject.

### *Argument and Law*

The fact that other students bullied Plaintiff in the past because she is gay provides no legal justification for censoring her non-disruptive, passive speech. Beginning with the seminal case of Tinker v. Des Moines Indep. Sch. Dist., 393 U.S. 503 (1969), and in case after case since, Courts have rejected Defendants' position.

Schools are only justified in restricting students' purely political speech if the speech would "*materially and substantially* interfere with the requirements of appropriate discipline in the operation of the school" or "collid[e] with the rights of others." *Id.* at 509. To justify censorship, school officials' fear of material and substantial interference must be based on something real and identifiable in the school setting because "undifferentiated fear or apprehension of disturbance is

not enough to overcome the rights to freedom of expression." *Id.* at 508.

Defendants' have not altered their stated reason for abridging Rebecca's speech rights, a reason this Court considered and rejected before granting the injunction. Defendants' position allows a heckler's veto in that it allows the fact that others might disapprove of the speech to justify silencing the speech. The Supreme Court in <u>Tinker,</u> and in legion other free speech cases since, has refused to endorse the heckler's veto. Specifically, the Supreme Court addressed the very fear Defendants claim here, that other students might react poorly to the speech, as follows:

> The District Court concluded that the action of the school authorities was reasonable because it was based upon their fear of a disturbance from the wearing of the armbands. But, in our system, undifferentiated fear or apprehension of disturbance is not enough to overcome the right to freedom of expression. Any departure from absolute regimentation may cause trouble. Any variation from the majority's opinion may inspire fear. Any word spoken, in class, in the lunchroom, or on the campus, that deviates from the views of another person may start an argument or cause a disturbance. But our Constitution says we must take this risk, *Terminiello v. Chicago*, 337 U.S. 1 (1949); and our history says that it is this sort of hazardous freedom—this kind of openness—that is the basis of our national strength and of the independence and vigor of Americans who grow up and live in this relatively permissive, often disputatious, society.

<u>Tinker</u>, 393 U.S. at 509 (citations in original).

Young people must spend a substantial portion of their lives in classrooms, so student expression cannot be suppressed simply because it gives rise to some slight, easily overlooked disruption, including but not limited to 'a showing of mild curiosity' by other students, discussion and comment among students or even some 'hostile remarks' or 'discussion outside of the classrooms' by other students. <u>Gillman ex rel. Gillman v. School Bd. For Holmes Co., Fla.</u>, 567 F. Supp. 2d 1359, 1370 (ND Fla. 2008). Simply put, the fact that others may disagree with the speech, or that the speech is unpopular, cannot serve as a basis for restricting speech. <u>Forsyth County Ga. V. Nationalist Movement</u>, 505 U.S. 123, 134-35 (1992) ("[l]isteners' reaction to speech is not a content-neutral basis for regulation" so government prohibited from burdening speech because it

4

might offend a hostile mob); Leonard v. Robinson, 477 F.3d 347, 360 (6th Cir. 2007).

Indeed, as this Court observed in its Memorandum Opinion, the argument that possible bullying of gay students can justify censorship of speech related to gay issues has been rejected many times over. At footnote three, this Court cited numerous cases to demonstrate the inadequacy of Defendants' position:

> Chambers v. Babbitt, 145 F. Supp. 2d 1068 (D. Minn. 2001) (rejecting school board ban on a t-shirt with the message "Straight Pride," notwithstanding evidence of "gay-bashing" speech and vandalism of a student's car who was perceived to be homosexual); Henkle v. Gregory, 150 F. Supp. 2d 1067 (D. Nev. 2001) (holding that student stated a claim for violation of his First Amendment right to speech when he alleged that school officials prevented him from openly stating that he was homosexual and retaliated against him for doing so); Fricke v. Lynch, 491 F. Supp. 381 (D.R.I. 1980) (holding that public school violated homosexual student's First Amendment right to speech and expression when it banned him from bringing a same-sex date to the prom, notwithstanding that the student and another homosexual student had previously been assaulted by other students and that the school was forced to provide additional security and escorts).

Moreover, Defendants reliance on the case of Defoe ex rel. Defoe v. Spiva, 625 F.3d 324 (6th Cir. 2010), is misplaced, because rather than supporting Defendants' contentions, Defoe shows just how serious and tangible the disruption must be before a school can censor student political speech.

Defoe involved a school district's prohibition of confederate flag imagery at a high school and in a community plagued by racial tension and violence. *Id.* In that case, the school produced uncontested evidence of racial violence, threats, and tensions at the school and within the community. *Id.* These incidents included:

> "two days after two black male students enrolled at ACHS, a large Confederate flag appeared draped in a school hallway; racial slurs such as "dirty niggers, sand niggers and dirty mexicans" were directed at Hispanic students; racially-charged graffiti including a Swastika and the words "niggers" and "white power," and the comments "White 4 Life" and "I Hate Niggas, J/K AVM"; graffiti including the name of a racially mixed couple along with "something about nigger-lover, white girl, black boy, in my school" and a picture of a hangman's noose; a black Clinton High School student involved in a leadership program at ACHS being called a "nigger" by a group of white ACHS students; Oreo cookies thrown onto the basketball court when a biracial Clinton High School basketball player attempted

5

to warm-up before a basketball game; and a physical altercation between a Hispanic student and a white male student stemming from the white student's reference to the Hispanic student's brother as a "sand nigger, dirty mexican."

*Id* at 334.

The problems related to race did not end there. Additional uncontested evidence pertaining to incidents and the racial climate at another local school included:

> a complaint from a black student's parent after the student was called a "nigger" on the school bus; a black student changing classes and transferring to Clinton High School based on his fear of a white student; incidents that occurred on ACCTC school buses stemming from racial epithets such as "nigger" and white students singing racial songs; a physical altercation resulting from a racial joke; a biracial female student being subjected to racist name-calling such that she "wanted to call home"; and difficulty recruiting minorities to ACCTC because potential minority recruits do not want to attend ACCTC due to racial tensions.

*Id.*

Finally, at yet another school in the district, more tangible evidence of disruption related to race included:

> racial graffiti including KKK references, and comments such as "I hate niggers," "Kill all the niggers," and "I hate this nigger-hating school. I'm going to blow it up"; the discovery of a noose in a student's locker along with stickers like "White Power," "KKK," and other racially-charged statements; and various unspecified race-related physical altercations.

*Id.*

In the face of this pervasive, persistent, tangible disruption, the Court in Defoe concluded that the school district had a legitimate basis upon which to predict that allowing a student to wear a confederate flag symbol would lead to additional substantial and material disruption. *Id.*

The case at bar is nothing like Defoe. In Defoe, the disruptions were hateful, persistent and sometimes violent. The disruptions burst from the seams of one school and flowed through an entire school district. Indeed, the school did not need to wait on the flag imagery to cause additional disruption, because substantial and material disruptions had already occurred around the issue for

6

years. In the case at bar, the only disruptions Defendants claim are that the Plaintiff, not other students, has been bullied. While horrifying, Plaintiff's bullying based on her sexual orientation is not a pervasive problem permeating the school system, and her speech is not the instrument of hate and intimidation, it is a passive expression of tolerance and acceptance.

Finally, although Defendants are correct that Defoe held that a school system need not wait on additional disruption if ample evidence already existed to predict future issues, *Id.*, Defendants are misreading the ruling. There was no evidence in the record that students in DeFoe wore confederate flag imagery *without incident*. Rather, there was ample evidence that racial imagery and speech had caused issues over and over again. As such, the fact that Plaintiff's shirt caused no problems is dispositive of the issue, particularly in light of the overwhelming case law that supports Plaintiff.

To censor speech, schools bear the burden of proving that a serious, pervasive disruption like the system proved in DeFoe exists. If anyone is causing or might cause a disruption in the future, it is other students, both known and hypothetical, who Defendants fear will bully Plaintiff. Rather than address their actually disruptive conduct, the school wishes to grant them a heckler's veto over Plaintiffs' speech.

Here, the school has presented no evidence of a serious disruption before or after Plaintiff wore her shirt. Rather, it has presented evidence that who she is, not what she or her t-shirt says, has subjected her to bullying. Neither DeFoe nor any other case allows censorship of Plaintiff merely because *she is gay*.

7

*Conclusion*

The Court should deny Defendants' motion for relief from this Court's Order because the evidence presented by Defendants does not justify censorship of Plaintiff's purely political, and therefore highly protected, speech.

Respectfully Submitted,

/s/ Mark J. Downton
Mark J. Downton, #020053
THE LAW OFFICE OF MARK J. DOWNTON
9005 Overlook Blvd.
Brentwood, Tennessee 37027
(615) 236-1440
lawyerdownton@gmail.com

ACLU Cooperating Attorney


/s/ Thomas H. Castelli
Thomas H. Castelli, #24849
American Civil Liberties Union Foundation of Tennessee
P.O. Box 120160
Nashville, Tennessee 37212
615-320-7142
615-691-7219 (facsimile)
tcastelli@aclu-tn.org

Attorneys for Plaintiff